# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SAM I AGGREGATOR LP, | ) | |
| | ) | |
| Plaintiff, Counterclaim-Defendant, | ) | |
| | ) | |
| v. | ) | C.A. No. 2023-1217-KSJM |
| | ) | |
| MARS HOLDCO CORP. and OPN HOLDINGS CO., LTD. f/k/a SYNQA CO., LTD., | ) | |
| | ) | |
| Defendants, Counterclaim-Plaintiffs. | ) | |
| | ) | |
| MARS HOLDCO CORP., OPN HOLDINGS CO., LTD. f/k/a SYNQA CO., LTD., and MERCHANT eSOLUTIONS, INC., | ) | |
| | ) | |
| Third-Party Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| INTEGRUM HOLDINGS LP and BRIAN HARTMAN, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: April 8, 2025
Date Decided: August 15, 2025

Peter J. Walsh, Jr., David A. Seal, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Michael Garvey, David Elbaum, SIMPSON THACHER & BARTLETT LLP, New York, New York; *Counsel for Plaintiff/Counterclaim-Defendant Sam I Aggregator LP and Third-Party Defendant Integrum Holdings LP.*

Kevin M. Coen, Emily C. Friedman, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Brandon F. Ranken, MAYER BROWN LLP, Houston, Texas; *Counsel for Defendants/Counterclaim-Plaintiffs and Third-Party Plaintiffs Mars HoldCo Corp., OPN Holdings Co., LTD. f/k/a SYNQA CO., LTD. and Merchant eSolutions, Inc.*

**McCORMICK, C.**

This action arises out of a Stock Purchase Agreement by which Sam Aggregator LP ("Seller") sold Sam I HoldCo Corp. (the "Company") to Mars Holdco Corp. ("Buyer"). Buyer asserts claims for fraud against Seller, alleging that Seller made false representations in the Stock Purchase Agreement. Buyer further alleges that Seller's CFO breached his fiduciary duties to the Company in the months leading up to the Agreement by providing confidential Company information to the Company's creditor and controller, Integrum Holdings LP. Buyer claims that Integrum aided and abetted in the CFO's breaches. Seller has moved to dismiss the claims for fraud, and Integrum has move to dismiss the claim for aiding and abetting. This decision grants both motions.

## I.    FACTUAL BACKGROUND

The facts are drawn from the Amended Answer, Affirmative Defenses, Counterclaims and Third-Party Claims, and the documents it incorporates by reference.[1]

### A.    The Stock Purchase Agreement

Seller and Buyer entered into the Stock Purchase Agreement (the "Agreement") on September 27, 2022.[2] Through the Agreement, Buyer acquired the Company, which owns a credit card payment processing business called Merchant

---

[1] C.A. No. 2023-1217-KSJM, Docket ("Dkt.") 44 (Defendants and Counterclaim-Plaintiffs' Amended Answer, Affirmative Defenses, Counterclaims and Third-Party Claims). Because this submission contains multiple pleadings, where relevant, this decision cites to each specific pleading within the document as follows: "Am. Answer," "Am. Counterclaims," and "Am. Third-Party Claims."

[2] *Id.*, Ex. 4 ("SPA").

eSolutions, Inc. ("MerchantE"). Buyer agreed to pay Seller $325 million at closing and an additional $50 million deferred payment (the "Deferred Payment") on the one-year anniversary of closing. Buyer's parent, OPN Holding Co. Ltd. ("OPN") guaranteed these payments. For simplicity, this decision refers to Buyer and OPN together as "Buyer." The transaction closed on November 10, 2022.[3]

Section 2.2 of the Agreement contains Seller's representations and warranties to Buyer regarding the transaction. "Except for the representations and warranties contained in . . . Section 2.2," Seller disclaimed any other express or implied warranty.[4] Buyer also represented that it relied solely on Seller's express representations in the Agreement and not on any information outside those representations.[5]

Under the Agreement, Buyer can only bring claims against Seller for "any breach of, or inaccuracy in, any representation or warranty" "based on Fraud of Seller."[6] The Agreement defines "Fraud" to require "an actual and intentional fraud with respect to any statement in any representation or warranty made by such Party

[3] Am. Answer ¶ 2.

[4] SPA § 2.2(x).

[5] *Id.* § 2.3(j) ("Buyer has not relied upon and is not relying upon the accuracy or completeness of any other information provided, disclosed or made available to Buyer. . . except to the extent expressly covered by the representations and warranties expressly set forth in this Agreement, the Transaction Documents or any certificate or instrument delivered in connection with the transactions contemplated by this Agreement, all as qualified by the Disclosure Letter as applicable.").

[6] *Id.* § 6.1.

2

set forth in Section 2.1, Section 2.2 or Section 2.3 (as applicable)[.]"[7]  It also states that "[u]nder no circumstances shall 'Fraud' include any equitable fraud, negligent misrepresentation, promissory fraud, unfair dealings, extra-contractual fraud or any other fraud or torts based on recklessness or negligence."[8]

Seller qualified its representations in a disclosure letter dated September 27, 2022 (the "Disclosure Letter").[9]  Each disclosure in the Disclosure Letter applies and qualifies a corresponding section of the Agreement.[10]  The Agreement contains an integration clause.[11]

## B.  The Owino Letter

On July 16, 2022, MerchantE's Chief Accounting Officer, Peter Owino, emailed concerns about accounting issues to the Company's CFO Brian Hartman, its outside consultants, and other employees.  He wrote that the Company was not properly accounting for its migration to Amazon Web Services ("AWS") under GAAP and the Accounting Standards Codification standards.

---

[7] *Id.* at A-9.

[8] *Id.*

[9] *See id.* § 2.2; Dkt. 44, Ex. 17 ("Disclosure Letter").

[10] Disclosure Letter at 1 ("Any disclosure set forth [herein] . . . shall be deemed to apply to and qualify the section or subsection of the Purchase Agreement to which it corresponds in number and each other section or subsection of the Purchase Agreement to the extent that it is reasonably apparent on its face that such information is relevant to such other section or subsection.").

[11] SPA § 6.7 (stating that the Agreement and related Transaction Documents "constitute the entire agreement, and supersede all other prior agreements, understandings, representations and warranties both written and oral, among the Parties, with respect to the subject matter hereof").

3

MerchantE fired Owino on September 8, 2022. On September 21, 2022, one week before the parties signed the Agreement, Owino's counsel sent a six-page demand letter to MerchantE's Chief Human Resource Officer (the "Owino Letter").[12] In it, Owino alleges that he had been instructed to improperly capitalize certain expenses in violation of GAAP and claims that his employment was terminated in retaliation for raising these concerns.

In response, MerchantE's CEO prepared an internal memorandum titled "ME Accounting Observations 3Q2022" dated September 23, 2022.[13] The memorandum listed "[s]ignificant gaps in accounting activities and documentation in accounting in the context of . . . [the] sale of MerchantE" and noted that "these activities should have been completed by June 30, given the transaction date[.]"[14]

Seller's Disclosure Letter refers to the Owino Letter in five separate sections.[15] Section 2.2(h)(i) of the Disclosure Letter states:

> On September 21, 2022, MerchantE received a letter from counsel of Peter Owino, a former employee (Chief Accounting Officer) of MerchantE containing various allegations against MerchantE. The foregoing dispute is referred to herein as the "Peter Owino Matter."[16]

---

[12] Dkt. 44, Ex. 2.

[13] *Id.*, Exs. 7 (Email transmitting memorandum), 8 ("Accounting Observations Memorandum").

[14] Am. Counterclaims ¶ 25 (citing Accounting Observations Memorandum).

[15] Disclosure Letter §§ 2.2(f), 2.2(h), 3.1(a), 3.19, and 3.20.

[16] *Id.* § 2.2(h)(i)(5).

Disclosure Letter Section 2.2(f)(iii) also identifies the "Peter Owino Matter" as qualifying all of Seller's representations in Agreement Section 2.2(f)(iii).[17]

During due diligence, Buyer asked Seller for an indemnity covering the Peter Owino Matter, and Seller agreed. In Disclosure Letter Section 3.19, Seller indemnified Buyer for any amounts paid by the Company post-closing "in settlement of [Owino's] allegations against MerchantE made in the attorney demand letter sent on his behalf to MerchantE, dated September 21, 2022."[18]

## C.    The AWS Migration

When the parties entered the Agreement, MerchantE was mid-way through migrating its business to a cloud-based computer processing system operated by AWS. The Company was in the second phase of the migration. Buyer alleged that AWS was necessary for its IT assets to function. So, if Buyer halted the migration post-closing, Buyer would incur costs associated with unwinding the migration and reverting to another platform. The Agreement did not list AWS as a liability.

Before the parties entered the Agreement, on May 11, 2022, Integrum's Colin Rhind emailed MerchantE's then-Vice President of Financial Planning and Analysis, Chad Zito, asking how the Company accounted for the migration. Zito added Financial Planning and Analysis Manager Daniel Hataway to the email, who replied that the costs were incorporated into a "Project Capitalization Excel" spreadsheet.[19]

---

[17] *Id.* § 2.2(f)(iii).

[18] *Id.* § 3.19(a), (c); *see also* SPA § 3.19(a), (c).

[19] *See* Am. Counterclaims ¶ 34.

That spreadsheet represented that the cost of the migration to the Company in August 2022 was $385,557.[20] It also showed that MerchantE's total software capitalization was $4,273,282, which included the costs associated with IT assets like the migration.[21]

On June 28, 2022, Seller's consultant, Matt Boscoe, emailed Zito and other MerchantE employees that the 2022 annualized spend for the migration was at least $1,500,000.[22] Later that day, he estimated that the total migration expenditure would be $1,756,333.[23] The Company's Vice President of Technology Business Operations responded with a cost breakdown that estimated there were "$400k in software costs" outside of the migration and that there would be "an additional $208,333 AWS operations costs for the 1st 3 years and $91,000 for year 4 and 5."[24]

In October 2022, MerchantE employees discussed OPN's inquiry into the nature of the costs associated with AWS. Rhind asked the Company's CFO and other employees to provide a more comprehensive answer on how they estimated the amount they intended to spend on AWS for the rest of the year. Boscoe responded that they were still trying to confirm the terms of the Company's service agreement with AWS.

---

[20] *Id.* ¶ 36.

[21] *Id.* ¶¶ 37–38.

[22] *Id.* ¶ 43.

[23] *Id.* ¶ 44.

[24] *Id.* ¶ 47 (cleaned up).

**D.     The Aiding And Abetting Allegations**

Integrum controlled Seller prior to the action and executed a Restrictive Covenant Agreement with Buyer as part of the transaction.   Buyer alleges that, before the merger, Integrum was conspiring with Hartman to force MerchantE to file for Chapter 11 bankruptcy.   The bankruptcy would allow Integrum, positioned as secured creditor, to purchase MerchantE at a discount.

Hartman worked with Integrum's CEO Tagar Olson between 2005 and 2012 before he became MerchantE's CFO.   Hartman served as Vice President, Corporate Controller for one of Olson's private equity firm's portfolio companies.

After closing, OPN discovered that Hartman disclosed confidential information to Integrum between June and September 2023.   Hartman deleted much of the correspondence, which OPN discovered through a forensic investigation.

Through the deleted correspondence, OPN learned that:

- On July 13, 2023, Hartman provided Integrum's Rhind with an update on MerchantE's financial status, including details on potential legal obligations and the amount of cash it had.[25]

- On July 17, 2023, Hartman provided Rhind with the Company's June 2023 financials.[26]

- On July 20, 2023, Hartman forwarded emails between him and the Company's outside auditor, KPMG, to Rhind.[27]

- On July 22, 2023, Hartman sent the Company's 2022 audited financials and KMPG's audit opinion to Rhind.[28]

---

[25] Dkt. 44, Exs. 20–21.

[26] *Id.*, Ex. 22.

[27] *Id.*, Ex. 23.

[28] *Id.*, Exs. 24–25.

7

- On July 23, 2023, Hartman forwarded Rhind an email entitled "MerchantE + Opn Intercompany Loan Transaction" that he had received from OPN's general counsel.[29]

- On July 25, 2023, Hartman forwarded KPMG's finalized audit report, attaching the Company's 2022 audited financials and other files labeled "for internal purposes only."[30]

- On August 23, 2023, Hartman asked Rhind whether he or the Company's Head of Sales could receive payment under MerchantE's expired Long-Term Incentive Program. The next day, Rhind agreed to ask Integrum's outside counsel about it.[31]

- On August 29, 2023, Rhind told Hartman that he was unable to share the April 2022 Disclosure Schedule, and that he could not make a claim against the representations and warranties policy to capture the Long-Term Incentive Program.[32] Hartman also provided additional updates to Rhind, including changes in executive roles, that a longtime customer ceased operations and Hartman anticipated chargebacks, and the Company's August cash reserves.[33]

- On August 31, 2023, Hartman forwarded Rhind the Company's outside counsel's analysis of MerchantE's position as a bankruptcy creditor.[34]

- On September 2, 2023, Hartman forwarded Rhind correspondence between OPN board members and MerchantE executives discussing the average employee salary, a reduction in force initiative, severance calculations, IT consulting costs, and savings regarding contract spending. He also disclosed that OPN was reviewing MerchantE's financial and operational status and conversations with OPN's general counsel on refinancing. Hartman discussed changes in the severance policy and additional funding from OPN, which he felt "will not be

---

[29] *Id.*, Exs. 27–28.

[30] *Id.*, Ex. 29.

[31] *Id.*, Exs. 30–31.

[32] *Id.*, Ex. 32.

[33] *Id.*, Ex. 33.

[34] *Id.*, Ex. 34.

material or significant in the time frame we are looking at" and would follow up with a high-level analysis for Rhind's review.[35]

On September 6, 2023, Hartman exchanged emails with an employee from Deloitte, Touche Tohmatsu. He discussed MerchantE's potential Chapter 11 bankruptcy, including the consequences of chargebacks, and that the Company may file if its sponsor bank did not assist it. He also stated that "[t]here is also a buyer who started diligence today," alluding to Integrum.[36]

### E. This Litigation

Seller filed this action on December 5, 2023, asserting claims for breach of contract and seeking specific performance to secure the Deferred Payment.[37] Buyer answered the complaint on February 26, 2024, asserting a fraud counterclaim against Seller and third-party claims against Hartman and Integrum.[38] In March 2024, Seller moved for judgment on the pleadings with respect to its claims and to dismiss Buyer's counterclaim.[39]

In response, Buyer paid Seller the Deferred Payment and agreed to a consent order requiring payment of the prejudgment interest that accrued during the period when payment was withheld. On May 21, 2024, the court entered the parties' stipulation mooting Seller's claims.[40]

---

[35] *Id.*, Ex. 36.

[36] *Id.*, Ex. 37.

[37] Dkt. 1.

[38] Dkt. 19.

[39] Dkts. 25–29.

[40] Dkt. 47.

9

Buyer filed an amended answer, counterclaims, and third-party claims on May 19, 2024 ("Buyer's Complaint").[41] Buyer's Complaint contains four Counts—one counterclaim and three third-party claims.[42] In Counterclaim Count I, Buyer asserts a fraud claim against Seller based on Section 2.2 of the Agreement. In Third-Party Claims Counts I and II, Buyer claims that Hartman breached his fiduciary duties to the Company. In Third-Party Claim Count III, Buyer claims that Integrum aided and abetted Hartman's breaches.[43]

In May, 2024, Seller, Hartman, and Integrum moved to dismiss the counterclaims and third-party claims.[44] The parties completed briefing the motions on September 11, 2024.[45] Buyer reached a confidential settlement with Hartman, and on October 17, 2024, the court dismissed the claims against him with prejudice.[46] The court heard oral argument on the motions to dismiss the remaining claims on April 8, 2025.[47]

## II.   LEGAL ANALYSIS

Seller and Integrum have moved to dismiss the amended counterclaim for fraud and third-party claim for aiding and abetting under Court of Chancery Rule

---

[41] Dkt. 44.

[42] Am. Counterclaims ¶¶ 39–46; Am. Third-Party Claims ¶¶ 59–80.

[43] MerchantE joins OPN and Mars Holdco Corp. in their Third-Party Claim. This decision refers to all parties asserting claims as "Buyer" for the sake of clarity.

[44] Dkts. 28, 29, 48.

[45] Dkts. 67–68.

[46] Dkt. 74.

[47] *See* Dkt. 84.

12(b)(6). "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[48] When considering a Rule 12(b)(6) motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true, . . . draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof."[49] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[50]

## A. Fraud

Buyer alleges that Seller committed fraud by falsely representing in Section 2.2(f)(iii) of the Agreement (the "Accounting Process Representations") facts contrary to those identified in the Owino Letter—that Buyer had internal accounting controls to ensure transactions comply with legal and accounting requirements. Buyer further alleges that Seller committed fraud by falsely representing in Section 2.2(f)(ii) of the Agreement (the "Liabilities Representations") that it had no undisclosed liabilities, when Seller knew that it had committed to the AWS migration.[51]

To state a claim for fraudulent inducement under the common law, a plaintiff must plead: "(1) a false statement or misrepresentation; (2) that the defendant knew

---

[48] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

[49] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[50] *Price v. E.I. DuPont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[51] Am. Counterclaims ¶¶ 67–68.

11

was false or made with reckless indifference to the truth; (3) the statement induced the plaintiff to enter the agreement; (4) the plaintiff's reliance was reasonable; and (5) the plaintiff was injured as a result."[52] And Court of Chancery Rule 9(b) requires that falsity of any statement or representation be pled with particularity.[53] That requires a plaintiff to plead "the time, place, and contents of the false representations; the facts misrepresented; the identity of the person(s) making the misrepresentation; and what that person(s) gained from making the misrepresentation."[54]

Parties to merger transactions can contractually circumscribe exposure to post-closing claims of fraudulent inducement. The parties have done so here in two ways.

First, Seller bargained for an anti-reliance provision. A seller can bargain for an anti-reliance provision, or "limits on . . . what information the buyer is relying upon[.]"[55] And Delaware courts enforce these provisions. "[W]here a plaintiff seeks to hold a defendant liable for alleged lies made *outside* the contract, a party's clear contractual promise disclaiming reliance on such extra-contractual statements will bar that claim."[56] In Section 2.3(j) of the Agreement, Buyer agreed that it would not

---

[52] *Online HealthNow, Inc. v. CIP OCL Invs., LLC*, 2021 WL 3557857, at *9 (Del. Ch. Aug. 12, 2021) (citation omitted).

[53] *See* Ct. Ch. R. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

[54] *Valley Joist BD Hldgs., LLC v. EBSCO Indus., Inc.*, 269 A.3d 984, 988 (Del. 2021).

[55] *Online HealthNow*, 2021 WL 3557857, at *1 (citation omitted) (cleaned up).

[56] *Id.* at *12 (emphasis in original); *see also MidCap Funding X Trust v. Graebel Cos., Inc.*, 2020 WL 2095899, at *19 (Del. Ch. Apr. 30, 2020) ("[A] party cannot promise . . . that it will not rely on promises and representations outside of the agreement and then shirk its own bargain in favor of a 'but we did rely on those other representations'

rely on any statements by the Company or Seller other than the Company's express representations in the Agreement. Also in Section 2.2(x), the Company disclaimed any extra-contractual representations. These provisions establish that Buyer disclaimed any reliance on extra-contractual statements.

Second, Seller bargained for a "fraud carve-out" provision.[57] A seller can obtain from a buyer an agreement to a heightened intent standard that limits post-closing fraudulent inducement claims to those claims predicated on a seller's "conscious participation in the communication of lies to the [b]uyer."[58] In Section 2.3, the parties agreed to limit Buyer to actions based on "actual and intentional fraud with respect to any statement in any representation or warranty."[59] They further agreed that this language precludes any claims for "extra-contractual fraud or any other fraud or torts based on recklessness or negligence."[60]

### 1. The Owino Letter

In the Accounting Process Representations, Seller stated that

> MerchantE has, and continues to implement, a system of internal accounting controls and procedures sufficient to

fraudulent inducement claim." (quoting *ABRY P'rs V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1057 (Del. Ch. 2006)).

[57] *See* Glenn D. West, *That Pesky Little Thing Called Fraud: An Examination of Buyers' Insistence Upon (and Sellers' Too Ready Acceptance of) Undefined "Fraud Carve-Outs" in Acquisition Agreements*, 69 BUS. LAW. 1049, 1052 (2014).

[58] *See Express Scripts, Inc. v. Bracket Hldgs. Corp.*, 248 A.3d 824, 830 (Del. 2021) (quoting *ABRY P'rs*, 891 A.2d at 1057–58 (Del. Ch. 2006)).

[59] SPA at A-9 (defining Fraud); *id*. at § 2.3(j) ("Buyer hereby acknowledges . . . that, except in the case of Fraud, Buyer will have no claim against Seller, the Company or any of its Subsidiaries, or any of their respective equityholders, members, managers, directors, trustees, Affiliates or other Representatives, with respect thereto.").

[60] *Id*. at A-9 (definition of Fraud).

provide reasonable assurances that . . . (B) transactions comply with all legal and accounting requirements applicable to MerchantE[.] . . . Since January 1, 2019, except as set forth in Section 2.2(f)(iii) of the Disclosure Letter, MerchantE has not (1) identified any significant deficiencies or material weaknesses in the design or operation of the internal controls over finance reporting, . . . or (3) received any complaint, allegation, assertion or claim in writing regarding the accounting practices, procedures, methodologies or methods of the internal accounting controls of MerchantE, including any such complaint, allegation, assertion or claim that MerchantE has engaged in questionable accounting or auditing practices.[61]

Buyer alleges that this representation was false because MerchantE lacked sufficient accounting controls, as detailed in the Owino Letter received by Buyer before the deal closed.[62]

The problem with Buyer's theory is that the parties expressly qualified the Accounting Process Representations by the allegations in the Owino Letter. Section 2.2(f)(iii) states that, "[s]ince January 1, 2019, *except as set forth in Section 2.2(f)(iii) of the Disclosure Letter*, MerchantE has not" identified deficiencies covered by the Accounting Process Representations.[63] Section 2.2(f)(iii) of the Disclosure Letter identifies the "Peter Owino Matter" as an express limitation on the representations in Section 2.2(f)(iii) of the Purchase Agreement.[64] And the Disclosure Letter defines "Peter Owino Matter" as the "allegations against MerchantE."[65]

---

[61] *Id*. § 2.2(f)(iii).

[62] Am. Counterclaims ¶¶ 12–29.

[63] SPA § 2.2(f)(iii) (emphasis added).

[64] Disclosure Letter § 2.2(f)(iii).

[65] *Id*. § 2.2(h).

14

In response to this obvious flaw in their theory, Buyer attempts to cabin the "Peter Owino Matter" to an employment matter only. They argue that Seller did not adequately disclose the "allegations of pervasive accounting improprieties described in the Owino Letter" or Seller's internal observations of the accounting deficiencies.[66] But why would Seller expressly qualify its *Accounting Process Representations* with reference to something that was solely an employment matter? This is not a sensible construction of the parties' agreement.

Even if the carve-out for the Owino Letter was as limited as Buyer says, Buyer fails to plead the "actual and intentional" fraud required under the Agreement due to the carve-out. Put simply, it is not reasonable to infer that Seller intended to conceal from Buyer allegations expressly referenced five times in the Disclosure Letter and for which it agreed to indemnify Buyer.[67] Buyer maintains that the Accounting Process Representations were deliberately vague, as evidenced by the fact that Buyer only sought indemnity for an employment dispute rather than making any requests that deal with the accounting issues.[68] But this argument does not support the inference that Seller knew the accounting representations were false when made, just that the disclosures could have more clearly elaborated Owino's points.

Buyer argues that the internal MerchantE memorandum supports an inference of actual intent.[69] But that memo does not carry the weight Buyer places

---

[66] Dkt. 61 ("Buyer's Counterclaim Answering Br.") at 18–20.

[67] Disclosure Letter §§ 2.2(f), 2.2(h), 3.1(a), 3.19, and 3.20.

[68] Buyer's Counterclaim Answering Br. at 21–23.

[69] *See* Dkt. 44, Ex. 8.

on it for a few reasons. For starters, the memo was prepared in response to the Owino Letter and thus was part of the Owino Matter qualification to the Accounting Process Representations. Also, the memo documents MerchantE's rationale for terminating Owino, including job performance issues that had prompted MerchantE to hire a Chief Financial Officer.[70] At best, Buyer has alleged Seller investigated the substance of Owino's allegations (which it alerted them to) and identified some deficiencies. This does not show that Seller knew that Section 2.2(f)(iii)'s representations were false when made.

Seller's motion to dismiss the fraud claims based on the Accounting Process Representations is granted.

### 2. The AWS Migration

In the Liabilities Representations, Seller stated that

> Except as set forth on Section 2.2(f)(ii) of the Disclosure Letter, MerchantE does not have any liabilities (whether known, unknown, absolute, accrued, contingent or otherwise), other than (A) liabilities accrued for or reserved against on the Interim Balance Sheet; (B) liabilities that have arisen since the Interim Balance Sheet Date in the ordinary course of business of MerchantE; (C) liabilities incurred in connection with this Agreement and the other Transaction Documents and the transactions contemplated hereby and thereby; (D) liabilities included as current liabilities in the calculation of Working Capital; or (E) liabilities that would not reasonably be expected to be material, individually or in the aggregate, to MerchantE.[71]

---

[70] *Id.*

[71] SPA § 2.2(f)(ii).

Buyer alleges that this representation is misleading because Seller failed to disclose a significant liability: costs associated with completing the AWS migration.[72]

A "liability" for accounting purposes is "a present obligation of an entity to transfer an economic benefit."[73]  "To have a liability, an entity must have a present obligation, that is, the obligation exists at the financial statement date."[74]  And, "[a]bsent a present obligation, the occurrence or nonoccurrence of a future event does not by itself give rise to a liability."[75]  Thus, "[s]ome items commonly described as contingent liabilities satisfy the definition of a liability because the contingency does not relate to whether a present obligation exists but instead relates to one or more uncertain future events that affect the amount that will be required to settle the present obligation."[76]

Buyer does not plead that estimated costs associated with a future AWS migration constituted "a present obligation" of MerchantE to pay costs as of the closing.  It was not a present obligation.  And they were not costs as of closing.

---

[72] Am. Counterclaims ¶¶ 13, 30–59.

[73] Financial Accounting Standards Board, Conceptual Framework for Financial Reporting: Elements of Financial Statements (2021) at 9, available at: https://viewpoint.pwc.com/dt/us/en/fasb_financial_accou/statements_of_financ/con_8 _conceptual_fra/assets/chp4financestatement.pdf [hereinafter, "Elements of Financial Statements"].

[74] *Id.* at 11.

[75] *Id.* at 14; *see also Great Hill Equity P'rs IV, LP v. SIG Growth Equity Fund I, LLLP*, 2018 WL 6311829, at \*46 (Del. Ch. Dec. 3, 2018) ("Similarly, the post-closing termination of five hundred vendors in January of 2012, four months after closing, was not a material liability that existed at the time of closing.  An unrealized threat to a business model is not a 'liability.'").

[76] Elements of Financial Statements at 14.

Following closing, Buyer (not Seller) controlled whether and when MerchantE would complete the AWS migration, including the resources MerchantE would devote to the migration. For similar reasons, Buyer's attempt to classify the AWS costs as a contingent liability fails.[77] As of closing, AWS costs were not certain subject to some contingent event. The post-closing decision to incur those costs is not contingent event.

Seller's motion to dismiss the fraud claim based on the Liability Representations is granted.

## B. Aiding And Abetting

Buyer claims that Integrum aided and abetted in Hartman's breaches of fiduciary duties. Buyer alleges that Hartman owed MerchantE fiduciary duties as its CFO and breached those duties by disclosing confidential Company information to Integrum. Buyer further alleges that Integrum knew that Hartman was violating his duties when he revealed confidential information and substantially assisted Hartman's breaches.[78]

To state a claim for aiding and abetting, a plaintiff must allege that a third-party knowingly participated in a breach of fiduciary duty.[79] "A claim of knowing

---

[77] Buyer's Counterclaim Answering Br. at 32–33.

[78] Am. Third-Party Claims ¶¶ 79–84.

[79] *In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 72 (Del. 1995) ("A claim for aiding and abetting requires the following three elements: (1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, and (3) a knowing participation in that breach by [the non-fiduciary]."); *see also In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 97 (Del. Ch. 2014), *aff'd RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816 (Del. 2015).

participation need not be pled with particularity[,]" but a plaintiff must "make factual allegations from which knowing participation may be inferred in order to survive a motion to dismiss."[80] The element of knowing participation involves two concepts: knowledge and participation.[81] A plaintiff must plead "two types of knowledge" as to the aider and abettor: knowledge that the fiduciary breached his duties and knowledge that its own conduct was legally improper.[82] Participation too involves a "nuanced analysis" that requires allegations of "substantial assistance."[83]

Accepting the allegations against Integrum as true, they show that Hartman provided confidential Company information to Buyer. And it is easy to infer based on the nature of the information alone that Integrum knew that the information it received was sensitive and confidential.[84] There is nothing to suggest that Integrum viewed it as improper for Hartman to share confidential Company information with Integrum—the Company's alleged controller and significant creditor. Buyer does not allege why Integrum would have knowledge Hartman was violating any fiduciary

---

[80] *In re Xura, Inc., S'holder Litig.*, 2018 WL 6498677, at *14 (Del. Ch. Dec. 10, 2018) (first quoting *In re Shoe-Town, Inc. S'holders Litig.*, 1990 WL 13475, at *8 (Del. Ch. Feb. 12, 1990) then *Morgan v. Cash*, 2010 WL 2803746, at *4 (Del. Ch. July 16, 2010)).

[81] *See RBC Cap. Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015); *In re Mindbody, Inc., S'holder Litig.*, 332 A.3d 349, 389 (Del. 2024); *In re Columbia Pipeline Grp., Inc. Merger Litig.*, --- A.3d ---, 2025 WL 1693491, at *22–23 (Del. June 17, 2025).

[82] *Mindbody*, 332 A.3d at 390.

[83] *Id.* at 391–92.

[84] *See, e.g.*, Dkt. 44, Ex. 34 (August 31, 2023 email containing legal advice to the Company).

obligations by sending confidential information.  There is much less reason for Integrum to know that it was acting nefariously by receiving it.

Integrum's motion to dismiss is granted.

## III.    CONCLUSION

The motions to dismiss are granted.